# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY AND HIGHWAY LABORERS BENEFIT FUNDS, Derivatively On Behalf of Nominal Defendant AMERICAN INTERNATIONAL GROUP, INC., | ) Civil Action No. 08-CV-5240 )<br>)<br>) VERIFIED SHAREHOLDER'S ) DERIVATIVE COMPLAINT |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| MARTIN J. SULLIVAN, STEVEN J. BENSINGER, JOSEPH CASSANO, ROBERT LEWIS, STEPHEN F. BOLLENBACH, MARTIN S. FELDSTEIN, ELLEN V. FUTTER, RICHARD C. HOLBROOKE, FRED H. LANGHAMMER, GEORGE L. MILES, JR., MORRIS W. OFFIT, JAMES F. ORR, III, VIRGINIA M. ROMETTY, MICHAEL H. SUTTON, EDMUND S. W. TSE, ROBERT M. WILLUMSTAD, MARSHALL A. COHEN, STEPHEN L. HAMMERMAN, and FRANK G. ZARB, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants, | )<br>) |
| and | )<br>) |
| AMERICAN INTERNATIONAL GROUP, INC., | )<br>)<br>) |
| Nominal Defendant. | )<br>) |
| | ) DEMAND FOR JURY TRIAL |

Plaintiff Westchester Putnam Counties Heavy and Highway Laborers Benefit Funds ("Plaintiff"), by and through its undersigned attorneys, brings this action derivatively on behalf of American International Group, Inc. ("AIG" or the "Company"), and alleges based upon personal knowledge as to allegations pertaining to Plaintiff, and as to all other matters upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Nominal Defendant AIG against certain members of the Company's Board of Directors (the "Board) and certain of its executive officers seeking to remedy Defendants' violations of federal and state law, including, among other violations of law, breaches of fiduciary duties, corporate mismanagement, waste of corporate assets and violations of the Securities Exchange Act of 1934 (the "Exchange Act"), during the period May 11, 2007 through May 9, 2008 (the "Relevant Period").

2.      AIG is one of the world's largest insurers and one of the 30 companies comprising the Dow Jones Industrial Average.  AIG, through its subsidiaries, provides insurance and financial services on a global basis.  These services include, among other things, business insurance products, life insurance products, retirement services, financial services and asset management services.

3.      Defendants' breaches of fiduciary duty arise out of a scheme and wrongful course of conduct whereby Defendants (i) caused AIG to engage in unsound business and investment practices in which the Company assumed unreasonable exposure to asset-backed commercial paper, structured investment vehicles or collateralized debt offerings ("CDOs") secured by high-risk subprime mortgages; (ii) made repeated statements touting the Company's sophisticated and conservative risk management strategies and policies while concealing the true extent of AIG's susceptibility to massive losses in the Company's credit default swap ("CDS") portfolio; and (iii) caused the Company to disseminate materially false and misleading statements during the Relevant Period, and omit material information necessary to make such statements not false and misleading.

4.    As a result of Defendants' course of conduct, AIG reported a massive $7.8 billion loss in the first quarter of 2008 – the worst-performing quarter in the Company's 40-year history. The Company largely attributed this loss to the $9.1 billion additional decline in the valuation of its CDS portfolio.  Actual losses in AIG's CDS portfolio have been estimated to fall between $9 billion to $11 billion.

5.    As explained below, Defendants breached their fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  Because the majority of AIG's directors will not authorize a lawsuit against themselves, Plaintiff brings this action on behalf of AIG to, among other things, recover the damages caused by Defendants' malfeasance.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims arise in part under the Constitution and laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.    Venue is proper in this Court because AIG has its principal place of business in this District, Plaintiff's claims arose in this District, and AIG has suffered and will continue to suffer harm in this District and is a citizen of New York.  Venue is also proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and

defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district, and AIG is headquartered in this district.

## **THE PARTIES**

8.      Plaintiff owned AIG common stock before and at the beginning of the Relevant Period, currently owns AIG common stock, and has continuously held the stock.

9.      Nominal Defendant AIG is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 70 Pine Street, New York, NY 10270. AIG is a citizen of both New York and Delaware.

10.     Defendant Martin J. Sullivan ("Sullivan") served as the President and Chief Executive Officer of AIG at all times during the Relevant Period.  In addition, Sullivan has served as a director of the Company since 2002, and serves as the Chairman of the Audit Committee and a member of the Finance Committee.

11.     Defendant Edmund S. W. Tse ("Tse") serves as the Senior Vice Chairman of Life Insurance, Chairman of American International Assurance Company Limited, Chief Executive Officer of American International Assurance Company Limited, and Head of AIG's Worldwide Life Insurance Operations of American International Assurance Company Limited.  In addition, Tse has served as a director of AIG since 1996.

12.     Defendant Steven J. Bensinger ("Bensinger") served as the Executive Vice President and Chief Financial Officer of AIG at all times during the Relevant Period.  In addition, Bensinger serves as the Vice Chairman of Financial Services of the Company.

13.     Defendant Joseph Cassano ("Cassano") served as Head of the Financial Products Division at AIG at all times during the Relevant Period.

14.     Defendant Robert Lewis ("Lewis") served as Senior Vice President and Chief Risk Officer of AIG at all times during the Relevant Period.

15.     Defendants Sullivan, Tse, Bensinger, Cassano and Lewis are sometimes referred to collectively herein as the "Officer Defendants."  Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of AIG's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Officer Defendants are liable for the false statements pleaded below.

16.     Defendant Stephen F. Bollenbach ("Bollenbach") has served as a director of AIG since 2008.  In addition, Bollenbach serves as Chairman of the Regulatory, Compliance and Legal Committee and as a member of the Audit Committee.

17.     Defendant Martin S. Feldstein ("Feldstein") has served as a director of AIG since 1987.  In addition, Feldstein serves as a member of the Finance Committee and the Regulatory, Compliance and Legal Committee.

18.     Defendant Ellen V. Futter ("Futter") has served as a director of AIG since 1999. In addition, Futter serves as a member of the Nominating and Corporate Governance Committee and the Regulatory, Compliance and Legal Committee.

19.    Defendant Richard C. Holbrooke ("Holbrooke") has served as a director of AIG since 2001.    In addition, Holbrooke serves as Chairman of the Public Policy and Social Responsibility Committee.

20.    Defendant Fred H. Langhammer ("Langhammer") has served as a director of AIG since 2006.    In addition, Langhammer serves as a member of the Compensation and Management Resources Committee and the Finance Committee.

21.    Defendant George L. Miles, Jr. ("Miles") has served as a director of AIG since 2005.  In addition, Miles serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Public Policy and Social Responsibility Committee.

22.    Defendant Morris W. Offit ("Offit") has served as a director of AIG since 2005. In addition, Offit serves as Chairman of the Finance Committee and as a member of the Audit Committee and the Public Policy and Social Responsibility Committee.

23.    Defendant James F. Orr, III ("Orr") has served as a director of AIG since 2006. In addition, Orr serves as Chairman of the Compensation and Management Resources Committee and as a member of the Nominating and Corporate Governance Committee.

24.    Defendant Virginia M. Rometty ("Rometty") has served as a director of AIG since 2006.  In addition, Rometty serves as a member of the Compensation and Management Resources Committee and the Nominating and Corporate Governance Committee.

25.    Defendant Michael H. Sutton ("Sutton") has served as a director of AIG since 2005. In addition, Sutton serves as Chairman of the Audit Committee and as a member of the Regulatory, Compliance and Legal Committee.

26.    Defendant Robert M. Willumstad ("Willumstad") has served as Chairman of the Board of AIG since 2006.  In addition, Willumstad serves as an *ex-officio* member of all standing committees of the Board.

27.    Defendant Marshall A. Cohen ("Cohen") served as a director of the Company from 1992 to 2008, and served as the Chairman of the Compensation and Management Resources Committee and a member of the Nominating and Corporate Governance Committee during the Relevant Period.

28.    Defendant Stephen L. Hammerman ("Hammerman"), served as a director of the Company from 2005 to 2008, and served as the Chairman of the Regulatory, Compliance and Legal Committee and a member of the Public Policy and Social Responsibility Committee during the Relevant Period.

29.    Defendant Frank G. Zarb ("Zarb"), served as a director of the Company from 2005 to 2008, and served as a non-voting member of all standing committees of the Board during the Relevant Period.

30.    Defendants Sullivan, Tse, Bollenbach, Feldstein, Futter, Holbrooke, Langhammer, Miles, Offit, Orr, Rometty, Sutton, Willumstad, Cohen, Hammerman and Zarb are sometimes collectively referred to herein as the "Director Defendants."  By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all

shareholders equally and not in furtherance of their personal interest or benefit.  As a result of these duties, the Director Defendants are obligated to use their best efforts to act in the interests of the Company and shareholders to ensure that no waste of corporate assets occurs.  The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.    The Officer Defendants and the Director Defendants are sometimes collectively referred to herein as the "Individual Defendants."  Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

32.    Each of the Individual Defendants, by virtue of their positions as directors and/or officers of the Company, directly participated in the management of the Company, was directly involved in day-to-day operations of the Company at the highest levels and/or was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Such Defendants were involved in drafting, producing, reviewing, disseminating, approving, ratifying and/or recklessly permitting the dissemination of the false and misleading statements and information herein.  Defendants were aware or recklessly disregarded that false and misleading

statements were being issued regarding the Company, and approved or ratified these statements. In addition, Defendants were in a position and had a duty to implement procedures and controls to prevent the false and misleading statements, but completely abdicated their oversight responsibilities to the Company by failing to do so.

## ALLEGATIONS

### The Rise and Fall of Subprime Mortgage Lending

33.    The term " subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."[1]

34.    Between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.[2]

35.    Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to several factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.[3]

36.    In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to

---

[1]    *See Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* 110th Cong. (2007) (Statement of Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.).

[2]    Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[3]    *See Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., Federal Deposit Insurance Corporation).

qualify for certain loans and allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load (e.g., "no money down").[4]

37.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.   Examples of typical subprime mortgages are: interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10 years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates.[5]   These novel terms combined with the lowered lending standards contributed to the likelihood that many borrowers would default.

38.    As a result of these various incentives for subprime mortgages, subprime mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.[6]

39.    Meanwhile, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased risks for borrowers and lenders in the overheated housing markets.[7]

40.    Then housing troubles emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on variable rate loans, including mortgage loans, to rise.

---

[4]      *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1; *See also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 17, 2006.

[5]      *See* Liz Moyer, *Beware the Interest-Only Mortgage,* Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity*, Wall St. J., April 19, 2006, at D1 *and* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[6]      *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[7]      *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005.

41.     In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, issued new guidelines for mortgage lenders.[8]  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.[9]

42.     However, most subprime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."[10] Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired.  However, because housing prices were falling, borrowers could not readily re-sell the property for a profit when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

43.     In 2006, subprime mortgage exposure grew even riskier as lenders originated a large number of "liar loans" (no-documentation and low-documentation loans).  This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.[11] Mortgage industry research reported in April 2006 revealed that 90% of borrowers had

---

[8]      *Id.*; *See also Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., Federal Deposit Insurance Corporation).

[9]      *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[10]     *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount,* Wall St. J., Dec. 5, 2006.

[11]     Gretchen Morgenson, *Crisis Looms In Market for Mortgages,* N.Y. Times, Mar. 11, 2007.

overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases.[12]

## Background of AIG

44.     AIG, through its subsidiaries, provides insurance and financial services in the United States and internationally.  The Company operates in four segments: General Insurance, Life Insurance and Retirement Services, Financial Services, and Asset Management. The General Insurance segment underwrites various business insurance products, including large commercial or industrial property insurance, excess liability, inland marine, environmental, workers compensation, and excess and umbrella coverages.  This segment also offers various specialized forms of insurance, such as aviation, accident and health, equipment breakdown, directors and officers' liability, difference-in-conditions, kidnap-ransom, export credit and political risk, and professional errors and omissions coverages.  In addition, it provides property and casualty reinsurance products to insurers; automobile insurance products; residential mortgage guaranty insurance products; and second-lien and private student loan guaranty insurance products.

45.     AIG's Life Insurance and Retirement Services segment offers individual and group life, payout annuities, endowment, and accident and health policies, as well as retirement savings products consisting of fixed and variable annuities.  The Financial Services segment provides aircraft and equipment leasing, capital market transactions, consumer finance, and insurance premium financing.  The Asset Management segment operations comprise investment-related services and investment products, including institutional and retail asset management, broker-dealer services, and spread-based investment products.  The Company was founded in 1967 and is based in New York, New York.

---

[12]     *Id.*

**AIG and the Sub-Prime Mortgage Market**

46.    AIG engages in the residential mortgage market in at least four significant ways. First, the Company acts as a mortgage originator through its subsidiary American General Finance, Inc., which originates mortgages, including first-lien and second-lien residential sub-prime mortgages.

47.    Second, AIG's insurance and financial subsidiaries invest in collateralized debt obligations ("CDOs") and mortgage-backed securities which utilize residential mortgage loans as collateral.    Third, AIG acts as a securitizer of sub-prime mortgages, which it packages into various securities, including CDOs, that it markets to investors.    Fourth, AIG, through its subsidiaries, acts as an insurer for investors looking to hedge risk on debt instruments tied to the residential mortgage market.

48.    CDOs are essentially mutual funds that buy securities backed by things like mortgages, auto loans and corporate bonds.    Specifically, after a loan is originated, it is often packaged up into an asset-backed security.    These are then sliced into different tranches and sold to institutional investors such as hedge funds and insurers.    CDOs became very popular among fixed-income investors looking for higher yields in a low-yield world.    In 1995, there were hardly any.    In 2006, CDOs worth more than $500 billion were issued.

49.    CDOs are usually constructed from a portfolio of fixed-income assets and are used to spread the risk of the underlying assets.    These assets are divided into different tranches: senior tranches, mezzanine tranches, and equity tranches.    Losses are applied in reverse order of seniority so junior tranches offer higher coupons (interest rates) to compensate for the added default risk.    But the system only works if the underlying asset backed securities held by the CDO are uncorrelated -- that is, if they are unlikely to go bad all at once.

50.     To the contrary, CDOs holding only subprime related investments (e.g., notes, bonds, and other instruments dependent on mortgages for their value) were highly correlated because they held only subprime securities and were therefore vulnerable to a rise in defaults on subprime mortgage loans.  Nonetheless, because of the high yields associated with subprime mortgages, these mortgages became very attractive for investment banks securitizing CDOs.[13]

51.     AIG, through its subsidiary AIG Financial Products ("AIGFP"), issues credit protection through its CDS portfolio on select senior CDOs.  CDSs are used by investors to hedge risk exposure on CDOs and other debt securities.  CDSs are derivative instruments in which one party agrees, for a periodic fee, to assume the risk of non-payment on an underlying asset.  In the event of a default on the underlying asset, the seller of the CDS is obligated to compensate the purchaser of the credit protection for the defaulted amounts.

52.     The value of a CDS is derived from the quality of the underlying asset.  The price of a swap is set by the expected likelihood of a default and the probable amount of the loss, or the "loss severity."  The "value" of the swap is therefore the amount of payments due to the seller over the life of the swap, less the likely default payments the seller will owe the purchaser.  As the amount of the default payments increases, the value of the swap decreases.

53.     In other words, as the value of the underlying CDO or other source of payments goes up, the potential liability of the CDS seller goes down.  The lower potential liability means more of the premium AIG received in selling the credit protection is available as earnings.  However, the inverse is also true.  As the underlying credit goes down, more of AIG's premiums will be used to pay for losses, and the Company's earnings will diminish as a result.

---

[13]     *See* FDIC Outlook, *A New Plateau for the U.S. Securitization Market*, *available at* http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

54.     During the Relevant Period, AIG, through AIGFP, was the courterparty on CDSs hedging the risk of failure to pay or other credit conditions for at least $527 billion in debt, including over $78 billion in CDOs as of December 31, 2007.

55.     Accounting for derivative instruments, including CDSs, is governed by Statement of Financial Accounting Standard ("FAS") 133.  FAS 133 requires that derivative instruments such as credit default swaps be "marked to market" at the end of each reporting period.  This means that the derivative is valued on a company's books at its current market value, with any gains or losses from the prior period increasing or decreasing current earnings.

56.     FAS 107, as amended by FAS 133, requires a company to "disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value."  Quoted market prices are the best evidence of fair value.

57.     Where there are no quoted market prices, as was usually the case with AIG's CDSs, AIG would "mark-to-model."  The Company would estimate the fair value of its CDSs based on inputs and assumptions taken from current market indicators or comparable investments.  This mark-to-model approach was allowed so long as the fair value estimate is "practicable."

58.     According to AIG's annual report on Form 10-K for fiscal year 2006 ("2006 Form 10-K"), AIG performed the required market value assessment on its derivative instruments under the following stated policy:

Fair Value Determinations Of Certain Assets And Liabilities (Financial Services):

- SD *Valuation models:* utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.

- *Market price data:* AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its models. When such data is not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable prices from trades occurring on dates nearest to the dates of the transactions.

59.    Defendants repeatedly touted the quality of the Company's CDS portfolio.  For example, in the Company's 2006 Form 10-K signed by Defendants Sullivan and Bensinger, Defendants stated the following:

> AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses."  **The threshold amount of credit losses that must be realized before AIGFP has any payment obligations is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligations by AIGFP under each transaction is remote, even in severe recessionary market scenarios**.  (emphasis added).

**Defendants Cause AIG to Issue False and Misleading Financial Statements**

60.    Throughout the Relevant Period, Defendants caused AIG to repeatedly issue false and misleading statements regarding the Company's financial condition and false assurances regarding the sufficiency of its risk-management processes.

61.    As early as 2006 the imminent collapse of the subprime lending industry was widely-documented.  In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market.[14]  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.

62.    Indeed, by the spring of 2007, the collapse of the subprime lending industry was well underway.  As of March 2007, more than two dozen subprime mortgage lenders had failed

---

[14]    Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006.

or filed for bankruptcy.[15]  This signaled that the value of securities tied to subprime mortgages, including the CDO securities in AIG's CDS portfolio, would sharply decline in value especially given their illiquid nature.

63.    Nevertheless, in 2007, the Individual Defendants caused or allowed the Company to issue materially false and misleading statements, and omitted to disclose information necessary to make such statements not false and misleading.

64.    On May 10, 2007, after the market closed, AIG issued a press release announcing its financial results for the first quarter of 2007 and filed its Form 10-Q with the SEC ("2007 First Quarter 10-Q").  The Company reported net income of $4.13 billion or $1.58 per diluted share, compared to $3.20 billion or $1.22 per diluted share in the first quarter of 2006.

65.    In addition, the Company reported adjusted net income, which purported to exclude the effects of FAS 133 losses of $205 million.  These losses were attributed to the "effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses.  In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily in its Capital Markets operations."  Thus, the loss was attributed to fluctuations in the value of its own economic hedges, rather than derivative securities portfolios held by the Company.

66.    Commenting on the results, Defendant Sullivan stated the following:

AIG had a very good quarter, with strong performance in our worldwide General Insurance businesses, continued improvement in Foreign Life Insurance, and solid results at ILFC and Asset Management.

In General Insurance, the Domestic Brokerage Group and Foreign General reported strong growth in operating income on excellent underwriting results and increased net investment income. United Guaranty's results were adversely

---

[15]    *See* Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.

affected by the continued slowdown in the U.S. residential real estate market. Domestic Personal Lines reflects strong underwriting results in the direct auto business and continued profitable growth from the Private Client Group.

Domestic Life Insurance results were driven by in-force growth and increased net investment income in the life insurance and payout annuity businesses, while Domestic Retirement Services experienced a decline in deposits and increased surrender activity. In Foreign Life Insurance & Retirement Services, most product lines and regions performed well.

In Financial Services, aircraft lease rates remained strong as did demand for ILFC's modern fuel-efficient fleet. AIG Financial Products experienced slower transaction flow compared to a strong first quarter of 2006. While the slowdown in the U.S. residential real estate market affected American General Finance's results, prior action taken to limit certain geographic and product exposures has helped AGF avoid some of the significant credit deterioration currently facing the real estate lending industry. First quarter 2007 consumer finance operating income was adversely affected by a $128 million pre-tax charge relating to ongoing discussions with the Office of Thrift Supervision relating to loans originated in the name of AIG Federal Savings Bank.

Asset Management results increased compared to the first quarter of 2006, due primarily to growth in Guaranteed Investment Contracts which benefited from higher partnership income, which will vary from period to period. Growth in Institutional Asset Management revenues and operating income was driven by contributions from all asset classes globally.

As our businesses execute on their growth strategies, we continue to seek opportunities to extend our global footprint, laying the groundwork for the future. For example, in March, AIG Global Investment Group received approval to set up a representative office in Tianjin, the third largest city in China in per capita GDP. AIG Consumer Finance Group added to its existing retail bank and credit card operations in Thailand by acquiring a majority interest in a secured lending company with a network of 138 branches. We have also taken initial steps to build an asset management and consumer finance franchise in India by acquiring a sales finance lending operation, establishing a real estate investment joint venture and launching our first equity fund. We believe these businesses complement our existing operations in these markets and offer future growth potential.

67.    Both Defendants Sullivan and Bensinger certified the results reported in the 2007

First Quarter Form 10-Q, representing, among other things, that (1) the report was free from

untrue statements of material facts or material omissions and (2) that each had "[d]esigned such

internal control over financial reporting, or caused such internal control over financial reporting
to be designed under our supervision, to provide reasonable assurance regarding the reliability of
financial reporting and the preparation of financial statements for external purposes in
accordance with generally accepted accounting principles."

68.     These certifications and statements, along with the disclosures in the Company's
press release and 2007 First Quarter Form 10-Q, were materially false and misleading.
Defendants failed to disclose losses in the Company's CDS portfolio, the amount of CDS
exposure related to residential mortgages and sub-prime mortgages in particular, or the fact that
AIG lacked adequate internal controls to determine the actual market value of its CDS
instruments required for accurate financial reporting.  The absence of any mention regarding
these facts, while reporting minimal amount of mark-to-market adjustments attributed to other
derivative activity, provided a false assurance that any exposure to the housing and credit crisis
was immaterial.

69.     In late June of 2007, a steep rise in the default rates on subprime mortgages
helped trigger the collapse of two subprime-based Bear Stearns hedge funds.[16]  During the
summer of 2007, the 'credit crunch' intensified and demand for CDOs completely stagnated, and
the number of companies disclosing significant losses from exposure to residential mortgages –
especially sub-prime mortgages – rose at an alarming rate.

70.     Despite Defendants' repeated assurances to the contrary, AIG was not immune to
the effects of the housing market collapse.  AIG shareholders became increasingly concerned
that the Company was also susceptible to these losses.

---

[16]     *See* Michael M. Grynbaum, *Bear Stearns Profit Plunges 61% on Subprime Woes*, N.Y. Times, Sept. 21, 2007.

71.     On August 1, 2007, MarketWatch reported that "AIG shares dropped more than 8% in July as investors worried the giant insurer could be hit by losses from declines in the value of subprime mortgages."

72.     A.G. Edwards analyst Paul Newsome stated that "AIG's shares have fallen significantly in past days.  Why we don't exactly know, but investors are telling us that it has something to do with the potential for AIG to suffer significant losses from subprime mortgages."

73.     On August 8, 2007, after the markets closed, AIG issued a press release announcing the Company's financial results for the second quarter of 2007 and Form 10-Q for the quarter ended June 30, 2007 ("2007 Second Quarter Form 10-Q").  The press release stated in pertinent part as follows:

> NEW YORK--Aug. 8, 2007--American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2007 was $4.28 billion or $1.64 per diluted share, compared to $3.19 billion or $1.21 per diluted share in the second quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses.
>
> Second quarter 2007 adjusted net income, as defined below, was a record $4.63 billion or $1.77 per diluted share, compared to $4.16 billion or $1.58 per diluted share in the second quarter of 2006.
>
> Net income for the first six months of 2007 was $8.41 billion or $3.21 per diluted share, compared to $6.39 billion or $2.43 per diluted share in the first six months of 2006. Adjusted net income for the first six months of 2007 was $9.02 billion or $3.44 per diluted share, compared to $7.53 billion or $2.87 per diluted share in the first six months of 2006.

* * *

74.     Commenting on the second quarter 2007 financial results, Defendant Sullivan stated the following:

Overall, AIG performed very well in the second quarter. Results were driven by solid growth in General Insurance, Life Insurance & Retirement Services, Asset Management and Capital Markets. Partnership returns remained strong, positively affecting investment income.

AIG's financial performance continues to reflect the competitive advantages of our diverse, global operations. With well positioned, market leading businesses and a balance sheet that now exceeds a trillion dollars in assets, we continue to successfully translate these strong attributes into specific strategies and positive business results. Management remains focused on expanding AIG's global reach, recently receiving approval to establish a wholly owned general insurance subsidiary in China, acquiring a mortgage finance company in India, and expanding our business cooperation agreement with the Bank of Investment and Development of Vietnam.

Within the organization, we are also taking steps that will enhance future performance. The continuing development of our economic capital model is helping us deploy capital more efficiently. Our Deliver the Firm initiative to leverage AIG's scale and scope is being embraced within the organization as a powerful means to generate new business. For instance, AIG Private Client Group and AIG Advisor Group recently formed a strategic alliance to enhance AIG's ability to serve the high-net-worth market by offering creative insurance solutions in addition to the broad range of investment options currently available. Additionally, worldwide recognition of our brand is increasing quickly through AIG's corporate advertising and brand-building sponsorships, including our sponsorship of Manchester United Football Club. In fact, AIG recently made its first appearance on BusinessWeek's annual 'Top 100 Brands' survey. AIG ranked 47th on the list of the most valuable global brands, ahead of all insurance competitors, with a brand value estimated at $7.49 billion.

During the second quarter of 2007, AIG increased book value and generated an adjusted return on equity of 19.8 percent, while returning capital to shareholders through share repurchases and increased dividends. We remain focused on creating long-term opportunities to grow at attractive rates of return and, ultimately, driving even greater shareholder value.

***We continue to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities***. However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call. (emphasis added)

75.    On August 9, 2007, certain AIG officials and executives, including Defendants

Sullivan, Cassano and Lewis, participated in an earnings conference call in which they provided

a PowerPoint presentation entitled "Residential Mortgage Presentation."[17]    During the

conference call, Defendants made false and misleading statements regarding AIG's CDS

portfolio and the Company's exposure to the mortgage market meltdown in order to calm

investor concerns.  Defendants misrepresented not only that there had been no losses on AIG's

CDS portfolio, but that any future losses were inconceivable.

76.    Defendant Lewis stated the following regarding the Company's exposure to the

market:

> AIGFP's exposure to the market is derived through two sources. First, they write **extremely risk remote, Super Senior or AAA+ credit protection on highly diversified pools of assets**, some of which include residential mortgages. Second, they are cash investors in highly rated securities where some portion of the underlying collateral, which may include collateral from many sectors, includes residential mortgages.
>
> While both of these activities involve significant notional exposure, **the risk actually undertaken is very modest and remote and has been structured and managed effectively**. AIGFP has been running a successful business of writing Super Senior credit default swap or CDS protection since 1998. As of June 30 this year they had a total net CDS exposure across all asset classes of $465 billion. The Super Senior portion, is the least likely to incur any losses in these deals since losses are allocated on a sequential basis from lowest to highest quality. **Before AIGFP would be at risk for its first dollar of loss, these structures would have to experience exceptional losses** that eroded all of the tranches below the Super Senior level, including a very significant AAA layer of protection. (emphasis added)

77.    Similarly, Defendant Cassano touted the Company's superior credit judgment,

stating the following:

> [I]t is hard to get this message across, but these are very much hand picked. We are very much involved in the process of developing the portfolios in which we are going to wrap and then picking the attachment points. And people who have been willing to work with us in order to do that to create the value that they do in these underlyings. And so the combination of the diversity, the combination of the underlying credit quality and then the stresses that we put it through to make sure

---

[17] The presentation was made available to investors prior to the call, and remains available at http://media.corporate-ir.net/media_files/irol/76/76115/REVISED_AIG_and_the_Residential_Mortgage_Market_FINAL_08-09-07.pdf (visited May 30, 2008).

that we can hit these marks, *it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those transactions*.

* * *

[W]e wanted to make sure, in this presentation we broke out exactly what everything looked like in order to give everybody the full disclosure, but *we see no issues at all emerging and we see no dollar of loss associated with any of that business in any reasonable scenario that anyone can draw. When I say a reasonable, I mean a severe recession scenario that you can draw out for the life of those securities*. (emphasis added)

78.    Defendant Sullivan also provided false reassurances to investors, stating:

*AIG's Financial Products portfolio, Super Senior credit default swaps is well structured, undergoes ongoing monitoring, modeling and analysis and enjoys significant protection from collateral subordination*. Certainly, we will be following this market closely during this period of volatility and correction and *we will continue to manage these risks carefully*.  However, in every period of uncertainty, there is also opportunity. *Given the high quality of our investments and our superior financial strength, AIG is poised to take advantage of these opportunities as they arise*. As I said, with all the uncertainty, recent volatility and on some occasions even panic in the market, hopefully *we have demonstrated that with our superior financial strength, liquidity, and cash flow while we believe AIG is a very safe haven in stormy times and while I remain extremely confident about our future*. (emphasis added)

79.    In addition, both Defendants Sullivan and Bensinger certified the financial results reported in the 2007 Second Quarter Form 10-Q, representing, among other things, that (1) the report was free from untrue statements of material facts or material omissions and (2) that each had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

80.    These certifications and statements, along with the disclosures in the Company's press release, the 2007 Second Quarter Form 10-Q and the August 9, 2007 conference call, were

materially false and misleading. Defendants failed to disclose losses in the Company's CDS portfolio, the amount of CDS exposure and losses directly related to residential mortgages and sub-prime mortgages in particular, or the fact that AIG lacked adequate internal controls to determine the actual market value of its CDS instruments required for accurate financial reporting in accordance with GAAP. The absence of any mention regarding these facts, while reporting minimal amount of mark-to-market adjustments attributed to other derivative activity, provided a false assurance that any exposure to the housing and credit crisis was immaterial.

81. On August 13, 2007, the *Wall Street Journal* reported on the results of the call as follows:

> Exotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers. But not at American International Group Inc. -- or so its executives say.
>
> The insurance giant did its best to reassure markets late last week that it wasn't going to get slammed by the crisis gripping mortgage and debt markets. Although AIG sees mortgage delinquencies rising, executives said during an earnings conference call that the bulk of its mortgage insurance and residential loans aren't at risk.
>
> ***The company also said it didn't see problems related to a kind of insurance contract, or derivative, it has written against financial instruments that include some subprime debt***. AIG based its all-clear signal for those derivatives on the fact that its internal models show that losses are extremely remote in the portions of the investment vehicles it's insuring. ***No likely losses means no reason to worry, the company reasoned***.
>
> ***Yet the company's valuation models seem to ignore the fact that those derivatives would likely take a haircut if sold in today's depressed market. "There's no way these aren't showing a loss***," says Janet Tavakoli, president of Tavakoli Structured Finance Inc., a Chicago research firm. ***That's simply a market reality, she adds, that should be showing up in AIG's results***.
>
> ***AIG counters that it doesn't see any loss in the instruments' value because they are insuring portions of financial vehicles that can withstand losses even under severe recessionary conditions***. (emphasis added)

82.    Because of Defendants' course of conduct during the Relevant Period, the credit quality of the assets underlying the Company's CDS portfolio had deteriorated to a point where significant defaults were a near-certainty, and the market value of the portfolio itself had declined substantially.   In addition, because of inadequate internal controls and Defendants' breaches of fiduciary duty, Defendants failed to properly evaluate and estimate expected losses that should have been taken in the first and second quarters of 2007, as well as when the false and misleading statements were made.

83.    Defendants' misrepresentations concerning the Company's true financial conditions continued into late 2007.  On November 7, 2007, AIG filed its third quarter Form 10-Q ("2007 Third Quarter Form 10-Q") after the close of the market.  Defendants Sullivan and Bensinger signed the 2007 Third Quarter Form 10-Q, in which Defendants admitted that the credit and mortgage crisis had resulted in a small third quarter loss in its CDS portfolio of $352 million.  Defendants also announced only a comparatively small projected fourth quarter loss of $550 million.  These losses were considered minimal given AIG's total exposure of $500 billion, and Defendant downplayed these small losses in the 2007 Third Quarter Form 10-Q:

> The ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP. . . . **AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives**. (emphasis added)

84.    On November 8, 2007, certain AIG officials and executives, including Defendants Sullivan and Lewis, participated in an earnings conference to discuss the 2007 third quarter financial results.  Commenting on AIG's exposure to the mortgage market crisis, Defendant Lewis again reassured the market that the Company's credit risk is remote:

> AIG Financial Products' exposure to the residential mortgage market continues to be derived through two sources. First, they are a writer of a **risk remote super**

*senior credit protection on highly diversified pools of assets*, which include residential mortgages. Second, they are cash investors in high-grade securities where, while the collateral comes from many sectors, some of it does include residential mortgages. While both of these activities involve significant notional exposure, *the ultimate credit risk actually undertaken is remote and has been structured and managed effectively*. (emphasis added)

85.    Defendant Sullivan continued to downplay AIG's exposure to the market crisis and reiterated that the Company's losses were minimal and not indicative of significant exposure:

> The loss taken this quarter reflects a change in the fair value of these derivatives due to the significant widening of credit spreads on the underlying collateral. *However it does not reflect the change in our view: AIG does not expect to pay any losses on this carefully structured and well-managed portfolio.* All super senior transactions are written to a zero loss standard, underlying collateral assets are analyzed and modeled to determine appropriate risk attachment points, so that all transactions have significant subordination below AIGFP's attachment point. (emphasis added)

86.    During the earnings call, Defendants again presented a PowerPoint presentation entitled "Residential Mortgage Presentation."[18] Defendants' presentation again failed to disclose material information regarding the Company's true exposure to the credit and mortgage crisis, and falsely represented that "AIG does not expect to be required to make any payments from [the Company's CDS portfolio] exposure."

87.    In addition, Defendants Bensinger and Sullivan certified AIG's 2007 Third Quarter Form 10-Q, representing (i) that the 2007 Third Quarter Form 10-Q "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading'" (ii) that "the financial statements, and other financial information included in [the Form 10-Q] fairly present[ed] in all material respects the financial condition, results of

---

[18] The presentation was made available to investors prior to the call, and remains available at http://media.corporate-ir.net/media_files/irol/76/76115/Revised_AIG_and_the_Residential_Mortgage_Market_3rd_Quarter_2007_Final_1 10807r.pdf (viewed May 30, 2008).

operations and cash flows of the [Company] as of, and for, the periods presented"; and (iii) that Defendants had "[d]esigned such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

88.    Despite these representations, Defendants failed to disclose, among other things, that (i) they had reported inaccurate losses for September and October 2007 using an inadequate valuation model under GAAP that was based on generic credit spreads on asset-backed securities rather than on any actual market data; and (ii) that such losses would have been substantially higher had they been reported appropriately using adequate valuation models under GAAP.

89.    On December 5, 2007, AIG held an investor meeting regarding the Company's exposure to the residential mortgage market meltdown.  At this meeting, Defendants disclosed that, despite their previous assurances that the Company's risk exposure to the credit and mortgage crisis was minimal, the value of the Company's CDS portfolio had declined between $1.05 and $1.15 billion since September 30, 2007.  Together with the loss disclosures in the 2007 Third Quarter Form 10-Q, the decline in AIG's "super senior" CDS portfolio for 2007 through November was between $1.4 and $1.5 billion, which was confirmed in a Form 8-K/A filed with the SEC on December 7, 2007.

90.    Despite this loss, Defendant Sullivan told shareholders that the possibility that the swaps would sustain a loss was "close to zero," that AIG was "confident in [its] marks and the reasonableness of [its] valuation methods," that the Company had "a high degree of certainty in" the losses that AIG had "booked to date" and that the Company's U.S. residential housing

market exposure levels "are manageable given AIG's size, financial strength and global diversification." With respect to the valuation models, Defendant Sullivan claimed that those models "have proven to be very reliable" and "provide AIG with a very high level of comfort." Sullivan concluded that "AIG has accurately identified all areas of exposure to the U.S. residential housing market."

91.     Defendants' reassurances again had the intended effect. On December 5, 2007, the *Wall Street Journal*'s blog *MarketBeat* reported the following:

> AIG's stock was the leading Dow component out of the gate, opening at $58 a share, up $2.55, or 4.6%, from Tuesday's $55.45 close. ***The rally was bolstered by statements from company executives during today's session that its exposure to housing is 'manageable,' and that it has no exposure to structured investment vehicles***, which hold a big load of the odorous mass known as collateralized debt obligations... Of course, the markets have heard this sort of thing before – losses expected to be contained weren't; exposures that looked healthy were less so – but ***saying one has no exposure, that's a bit more definitive***. (emphasis added)

92.     Defendants' statements during the Relevant Period were materially false and misleading because they failed to disclose and misrepresented the following material, adverse information: (i) losses to AIG's super senior CDS portfolio in October and November 2007 were in excess of $4 billion greater than what Defendants disclosed to investors at the December 5, 2007 investor meeting and in the December 7, 2007 Form 8-K; (ii) Defendants hid the Company's true losses by improperly netting against those losses $4.36 billion in offsets from supposed "cash flow diversion features" and "negative basis adjustment," which was not disclosed to investors; and (iii) because of Defendants' course of conduct, the Company had a "material weakness" in its internal controls over financial reporting.

93.     The Individual Defendants had actual knowledge of the foregoing material, adverse non-public information concerning the Company. The Individual Defendants also knew,

consciously disregarded, were reckless and grossly negligent in not knowing, or should have known that the Company's statements were false and materially misleading because of Defendants' failure to disclose the foregoing material, adverse information concerning AIG's financial predicament and the true state of its business prospects.

### The Truth Slowly Emerges

94.     On February 11, 2008, the Company filed a Form 8-K in which it admitted that its CDS portfolio losses were understated and that material information previously supplied to the market required correcting.  In particular, AIG's gross cumulative decline in the valuation of its CDS portfolio through November 30, 2007 was actually $5.96 billion, more than $4 billion greater than Defendants previously reported in December 2007.  In the 8-K, Defendants admitted that the Company had used improper "cash flow diversion features," "negative basis adjustments" and a modified Binomial Expansion Technique as a basis for its loss disclosures, resulting in understated losses.

95.     In addition, the February 11, 2008 8-K also revealed that the Company was advised by its auditors, PricewaterhouseCoopers LLC ("PWC"), that "they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the super senior credit default swap portfolio."

96.     Defendants' disclosures in the February 11, 2008 8-K failed to reveal the entire truth of AIG's exposure to the credit and market crisis.  In fact, the losses the Company had already sustained, and which Defendants continued to conceal from the market, were much higher.  Over the next several months, investors would slowly learn the staggering amount of

losses caused by Defendants' course of conduct during the Relevant Period that Defendants actively concealed from the investing public.

97.     On February 28, 2008, AIG filed its Form 10-K for the fiscal year 2007 ("2007 Form 10-K").  The 2007 Form 10-K contained additional disclosures demonstrating that the Company's prior statements regarding losses on its CDS portfolio had been false and misleading. Just weeks after Defendants' initial disclosures, the 2007 Form 10-K revealed that the cumulative value of the Company's CDS portfolio had actually dropped $11.5 billion.  As a result, the Company posted its largest quarterly loss ever of $5.3 billion.  AIG also revealed that its investment portfolio lost $3 billion in value due to losses from the Company's portfolio of residential mortgage debt.  Defendant Sullivan also reported that Defendant Cassano, head of AIGFP and the Company's CDS portfolio, had agreed to leave the Company.

98.     In addition, Defendants also revealed for the first time in the 2007 Form 10-K that AIG's CDS portfolio included $6.5 billion in liquidity puts written on CDOs linked to the sub-prime mortgage market.  These liquidity puts required the Company to purchase certain CDOs at par, provided the securities did not suffer a default, and represented substantial near-term liabilities for the Company.  The puts allowed purchasers of the sub-prime CDOs to force AIG to buy them back at the original price, despite the fact they had declined in value.  The purchasers would not likely exercise the puts until it was apparent that a default on the underlying collateral was imminent or at least likely.

99.     Furthermore, the 2007 Form 10-K revealed that AIG had actually repurchased $754 million of these securities in 2007, and that the Company had provided third-parties with $3 billion in liquidity facilities in case AIGFP was required to repurchase additional CDOs over the next three years.  These liquidity puts further demonstrate that Defendants knew or recklessly

disregarded AIG's exposure to the sub-prime mortgage market during the Relevant Period since the puts show that Defendants were aware that the market for CDOs had become significantly less liquid.

100.   The 2007 Form 10-K also includes a letter from PWC confirming that the Company's internal controls, relating to the AIGFP super senior CDS portfolio valuation process, had a material weakness and were ineffective.   The letter stated in pertinent part as follows:

> Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

* * *

> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

101.   On May 8, 2008, AIG issued a press release announcing the financial results for the first quarter 2008.   In the press release, Defendants admitted that the true amount of the

losses the Company had sustained had not been previously fully disclosed.  AIG's net loss for

the quarter was $7.8 billion.  The press release stated in pertinent part as follows:

> NEW YORK, May 08, 2008 -- American International Group, Inc. (AIG) today
> reported that the continuation of the weak U.S. housing market, the disruption in
> the credit markets, as well as equity market volatility, had a substantial adverse
> effect on its results for the first quarter ended March 31, 2008. These factors were
> primarily responsible for AIG incurring a net loss for the first quarter of 2008 of
> $7.81 billion or $3.09 per diluted share. The net loss, as reported, includes the
> effect of economically effective hedging activities that did not qualify for hedge
> accounting treatment under FAS 133 or for which hedge accounting was not
> applied, including the related foreign exchange gains and losses. For the 2007 first
> quarter, in which none of these external conditions existed in a material fashion,
> AIG reported net income of $4.13 billion or $1.58 per diluted share. First quarter
> 2008 adjusted net loss, as defined below, was $3.56 billion or $1.41 per diluted
> share, compared to adjusted net income of $4.39 billion or $1.68 per diluted share
> for the first quarter of 2007.

> AIG emphasized that despite the difficult environment and its resulting effect on
> AIG's overall financial performance for the first quarter, core insurance
> businesses continue to perform satisfactorily. AIG is confident that, although
> present economic conditions are difficult, AIG's unmatched competitive
> advantages, strong brand, and unmatched global franchise position it extremely
> well for the future.

> **AIG also today announced a plan to raise approximately $12.5 billion in capital
> to fortify its balance sheet and provide increased financial flexibility**. The capital
> is to be raised through a common stock offering and an equity-linked offering for
> an aggregate of approximately $7.5 billion. At a later date AIG also expects to
> issue high equity content fixed income securities. These offerings are designed to
> further strengthen AIG's significant financial resources and will enhance its
> ability to grow while maintaining the strength to withstand potential short-term
> market volatility.

>                                      * * *

> **Included in the first quarter 2008 net loss and adjusted net loss was a pre-tax
> charge of approximately $9.11 billion ($5.92 billion after tax) for a net
> unrealized market valuation loss related to the AIG Financial Products Corp.
> (AIGFP) super senior credit default swap portfolio**.

> **First quarter 2008 results included pre-tax net realized capital losses of $6.09
> billion ($3.96 billion after tax) primarily from other-than-temporary
> impairment charges in AIG's investment portfolio**. This compares to pre-tax net
> realized capital losses of $70 million ($56 million after tax) in the first quarter of

2007. The 2008 other-than-temporary impairment charges resulted primarily from the severe, rapid declines in market values of certain residential mortgage backed securities and other structured securities in the first quarter for which AIG concluded it could not reasonably assert that the recovery period would be temporary. (emphasis added)

102.    Despite the shocking disclosures of the extent of the Company's sub-prime exposure, outside experts continued to question Defendants' valuations, with some analysts placing AIG's actual losses on its CDS portfolio at $9 to $11 billion. For instance, in a draft prospectus issued pursuant to the offering of AIG common stock disclosed in the press release, the Company stated the following:

[A] third-party analysis provided to AIG that AIG understands uses credit and market value inputs estimates *the potential realized pre-tax losses on AIGFP's super senior credit default swap portfolio at between approximately $9 billion and approximately $11 billion*. (AIG expresses no view as to the reasonableness of this third-party estimate and does not intend to seek an update of this estimate.) (emphasis added)

103.    In response to these revelations, Standard & Poor's immediately downgraded AIG's credit rating, and the Company's stock plummeted 8.8% in value to close at $40.28 per share.

104.    On May 20, 2008, the Company raised over $20 billion in new capital to fortify itself from future losses related to its residential mortgage exposure, a substantial increase from the initial plan announced on May 8, 2008 to raise $12.5 billion. This effort to raise capital further underscores the desperate financial condition the Company finds itself in as a result of Defendants' breaches of fiduciary duties and improper course of conduct during the Relevant Period.

**DEMAND FUTILITY**

105.    Plaintiff brings this action derivatively in the right and for the benefit of AIG to redress damage suffered and to be suffered by AIG as a direct result of Defendants' breaches of fiduciary duty, corporate mismanagement, and abuse of control.

106.    AIG is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have.

107.    Plaintiff will adequately and fairly represent the interests of AIG and its shareholders in enforcing and prosecuting their rights.

108.    AIG's Board of Directors is currently composed of thirteen (13) directors – Defendants Sullivan, Tse, Bollenbach, Feldstein, Futter, Holbrooke, Langhammer, Miles, Offit, Orr, Rometty, Sutton, and Willumstad.  Each of these directors has been named as a defendant in this action.

109.    The Director Defendants owed a duty to AIG and its shareholders to be reasonably informed about the business and operations of the Company.  The Director Defendants completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

110.    Demand on the AIG Board of Directors to institute this action is not necessary because such a demand would be a futile and useless act, particularly for the additional following reasons:

    a.    The Director Defendants, as detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from AIG stockholders and investors and are, therefore, not

disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

b.     The Director Defendants had a responsibility and obligation to assure that all press releases and filings, including all financial reports, were accurate and that all internal controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

c.     In order to bring this suit, the Director Defendants would be forced to sue themselves and/or persons with whom they have extensive business and/or personal entanglements, which they will not do;

d.     The acts complained herein of constitute violations of federal and state law and the fiduciary duties owed by the Director Defendants and are incapable of ratification;

e.     The Director Defendants are currently defendants in other securities class action lawsuits arising out of the wrongdoing alleged herein and a suit by them to remedy the wrongs alleged herein would likely expose them to liability in the securities class actions; thus, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves and the other Defendants;

f.     The actions of the Director Defendants have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

g.     The misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment;

h.     AIG has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful course of conduct, nor have they attempted to recover any part of the damages AIG suffered and will suffer thereby; and

i.     Accordingly, the Director Defendants are so personally and directly conflicted and committed to the unlawful course of conduct in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

111.     Plaintiff has not made any demand on the shareholders of AIG to institute this action since such demand would be a futile and useless act for the following reasons:

a.     AIG is a publicly traded company with thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

c.     Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

<u>**COUNT I**</u>
**(Against the Individual Defendants for Violations of §10(b) and Rule 10b-5**
**of the Securities Exchange Act)**

112.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

113.     The Individual Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally

or recklessly employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company.

114.    The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

115.    The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and directors of the Company and were therefore directly responsible for the fraud alleged herein.

116.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained billions of dollars in damages.

## COUNT II
**(Against the Individual Defendants for Violations of §20(a) of the Securities Exchange Act)**

117.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

118.    The Individual Defendants, by virtue of their positions with AIG and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AIG within the meaning of § 20(a) of the Securities Exchange Act.  They had the power and influence and exercised the same to cause AIG to engage in the illegal and wrongful course of conduct and practices complained of herein.

## COUNT III
### (Breach of Fiduciary Duties of Care, Loyalty and Good Faith)

119.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

120.    Plaintiff asserts this claim derivatively on behalf of AIG against each of the Director Defendants.

121.    As alleged in detail herein, each of the Director Defendants had a duty to AIG and its shareholders to, amongst other things, ensure that the Company was operated in a diligent, honest and prudent manner.

122.    The Director Defendants have breached their fiduciary duties of care, loyalty and good faith owed to AIG and its stockholders by allowing the Company to assume billions of dollars in risky investment vehicles and concealing the true extent of the Company's exposure to and losses from such investments.

123.    Further, each of the Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124.    By reason of the foregoing, AIG has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

125.    Plaintiff and AIG have no adequate remedy of law.

## COUNT IV
### (Corporate Waste)

126.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

127.    Plaintiff alleges this cause of action on behalf of AIG against the Director Defendants.

128.    Each of the Director Defendants owes and owed to AIG the obligation to protect AIG's assets from loss or waste.

129.    The Director Defendants' failure to adequately evaluate and monitor AIG's risk in the CDO market constituted a waste of AIG's corporate assets and was grossly unfair to AIG. No person of ordinary, sound business judgment could conclude that the Director Defendants' decision to become so overextended in the risky CDO market was a sound exercise of business judgment.

130.    By reason of the foregoing, AIG has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

131.    Plaintiff and AIG have no adequate remedy at law for the wasteful and wrongful conduct engaged in by the Director Defendants.

132.    Plaintiff and AIG are therefore entitled to judgment against the Director Defendants as specified below.

## COUNT V
### (Against All Defendants for Abuse of Control)

133.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

134.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AIG, for which they are legally responsible.

135.    As a direct and proximate result of these defendants' abuse of control, AIG has sustained significant damages.

136.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## COUNT VI
### (Against All Defendants for Gross Mismanagement)

137.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

138.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AIG in a manner consistent with the operations of a publicly held corporation.

139.    As a direct and proximate result of these defendants' gross mismanagement and breaches of duty alleged herein, AIG has sustained significant damages.

140.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT VII
### (Against All Defendants for Contribution, Indemnification and Declaratory Relief)

141.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

142.   AIG is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to AIG.

143.   AIG's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and AIG is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against AIG by virtue of the Defendants' misconduct.

144.   Further, Plaintiff seeks a declaration that AIG has no duty to advance any legal fees to the Individual Defendants because they did not act in good faith or in any manner they believed to be in the best interest of the Company.

## COUNT VIII
**(Against All Defendants for Aiding and Abetting Breach of Fiduciary Duty)**

145.   Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

146.   In addition to directly breaching their fiduciary duty to the Company, the Individual Defendants aided and abetted the other Defendants' breaches of fiduciary duty in a grossly negligent, willful and reckless manner, as described above.

147.   These Defendants knowingly gave substantial assistance and encouragement to the other Defendants and each other in committing the grossly negligent, willful and reckless breach of fiduciary duties alleged above.

148.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

149. By reason of the foregoing, AIG was damaged.

150. Plaintiff, on behalf of AIG, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor and in favor of AIG against all of the Defendants as follows:

A. Against all the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to protect AIG and its shareholders from a repeat of the damaging events described in this Complaint, including but not limited to, adopting the following remedial measures:

a. strengthening the board's supervision and oversight responsibilities and developing a system to ensure the board accurately manages the Company's risk potential;

b. prohibiting any individual from concurrently serving as the Chief Executive Officer and the Chairman of the Board;

c. allowing the Company's shareholders to nominate at least one candidate for election to the board; and

d. a policy of ensuring the accuracy of the qualifications of AIG's directors, executives and other employees;

C. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts fees, costs and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June  6, 2008                **LAW OFFICES OF CURTIS V. TRINKO, LLP**


By: /s/ Curtis V. Trinko
Curtis V. Trinko (CT-1838)
Wai K. Chan (WC-0743)
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: 212 490-9550
Fax: 212 986-0158
Email: Ctrinko@trinko.com

**SAXENA WHITE P.A**
Maya Saxena
Joseph E. White III
Christopher S. Jones
Lester R. Hooker
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Tel: 561.394.3399
Fax: 561.394.3082

**Attorneys for Plaintiff Westchester Putnam Counties Heavy and Highway Laborers Benefit Funds**

## <u>AMERICAN INTERNATIONAL GROUP, INC. VERIFICATION</u>

I, Riccardo Iaccarino, as general counsel to Westchester Putnam Counties Heavy & Highway Laborers Benefits Funds, hereby verify under the penalty of perjury that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 6/6/08

Riccardo Iaccarino, General Counsel
Westchester Putnam Counties Heavy & Highway Laborers Benefits Funds